IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. ______________________

| | | |
|---|---|---|
| E.C., by and through his parents, HENRY COLEMAN and JEAHAN COLEMAN, HENRY COLEMAN, in his individual capacity, and JEAHAN COLEMAN in her individual capacity, Plaintiffs | ) | COMPLAINT |
| v. | ) | |
| CHARLOTTE-MECKLENBURG BOARD OF EDUCATION, MECKLENBURG PARTNERSHIP FOR CHILDREN, and THE SUNSHINE HOUSE, INC – N.C., Defendants. | ) | |

Plaintiffs, E.C., by and through his parents, Henry Coleman and Jeahan Coleman, and Henry Coleman and Jeahan Coleman individually, to the extent stated below, through counsel, allege as follows.

## INTRODUCTION

This action seeks review under the Individuals with Disabilities Education Act ("IDEA") of OAH's August 10, 2026 final dismissal of Case No. 26 EDC 00437 based on a disputed settlement. It also asserts independent disability-discrimination claims arising from E.C.'s exclusion from full-day preschool programming.

The Charlotte-Mecklenburg Board of Education (the "Board") operates Charlotte-Mecklenburg Schools ("CMS"). Mecklenburg Partnership for Children d/b/a Smart Start of Mecklenburg County ("Smart Start") administers MECK Pre-K. E.C. attended a MECK Pre-K classroom located within Sunshine House–Mint Hill, operated by The Sunshine House, Inc. – N.C. ("Sunshine House"). Plaintiffs distinguish administration of MECK Pre-K from operation of the host childcare center and allege each Defendant's own conduct below. IDEA judicial review and ADA Title II relief are sought against the Board only; Section 504 claims against the private Defendants require qualifying federal financial assistance. Title III relief is sought against Sunshine House as the private operator of a place of public accommodation, not on the premise that all schools are public entities.

E.C. is a minor child born in 2021 with documented developmental, communication, and sensory-regulation needs. Plaintiffs allege that those needs were known or reasonably suspected during his preschool enrollment and that delayed evaluation and reduced instructional access caused educational harm.

OAH's June 22, 2026 order established procedural Child Find liability after the Board's acknowledged November 19, 2025 notice. It expressly reserved eligibility and educational harm and remedies for hearing and did not hold that procedural violations necessarily denied a free appropriate public education

("FAPE"). The August 10 decision dismissed the Petition as moot while denying the competing settlement motions for lack of jurisdiction over contract claims.

Plaintiffs seek relief from the final dismissal, determination of the disputed settlement's binding effect and scope, adjudication of preserved educational issues, individualized compensatory education, appropriate reimbursement, and legally available relief for independently established disability discrimination and failure to provide reasonable accommodations. No freestanding state-law tort damages claim is asserted in this pleading.

## JURISDICTION AND VENUE

1. This Court has original jurisdiction under 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i)(2)(A) and (i)(3)(A) over the IDEA civil action and under 28 U.S.C. § 1331 over claims under Section 504, 29 U.S.C. § 794, and Title II of the ADA, 42 U.S.C. § 12132. The Court also has federal-question jurisdiction over Count V under ADA Title III, 42 U.S.C. §§ 12181–12189, including §§ 12182 and 12188(a).
2. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over related state-law questions of settlement formation, authority, and avoidance because the agreement was the stated basis for terminating the same educational controversy.
3. Declaratory relief under 28 U.S.C. §§ 2201–2202 is requested as a remedy within otherwise established jurisdiction, not as an independent jurisdictional grant.

Section 1415(e)(2)(F) or (f)(1)(B)(iii) is invoked only if the agreement resulted from the corresponding federally defined process.

4. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the relevant events occurred in Mecklenburg County in this District.

PARTIES

5. E.C. is a minor child born in 2021 who resided in Mecklenburg County at all relevant times. He sues through his parents and counsel.

6. Mr. and Mrs. Coleman are E.C.'s parents and legal guardians. They sue on his behalf and individually for their own IDEA participation rights, appropriate reimbursement, and determination of whether the settlement binds them. The discrimination counts are asserted on E.C.'s behalf; parental damages are not presumed from parenthood.

7. Defendant Charlotte-Mecklenburg Board of Education is a North Carolina local board of education with its principal place of business in Mecklenburg County. It operates CMS and is the local educational agency responsible for the IDEA obligations at issue. CMS denotes the Board's school system, not a separately named defendant. Upon information and belief, the Board receives federal financial assistance and is a public entity.

8. Defendant Mecklenburg Partnership for Children d/b/a Smart Start of Mecklenburg County is a North Carolina private nonprofit that, upon information

and belief, administers MECK Pre-K. Its Child Development and Family Support Director, Brittany Smith, and Child Development Consultant, Renee Little-Boyce, communicated and maintained the challenged schedule decisions as described below. Upon information and belief, Smart Start receives federal financial assistance for a covered program or activity, either directly or because of a pass-through recipient relationship.

9. Defendant The Sunshine House, Inc. – N.C. d/b/a Sunshine House–Mint Hill operates the childcare center at which E.C.'s MECK Pre-K classroom was located. It is alleged to be a South Carolina corporation registered to do business in North Carolina. Regional Director Whitney Griffin communicated its meal-accommodation requirements and received the November accommodation correspondence. Upon information and belief, Sunshine House receives qualifying federal financial assistance for the relevant program or activity or as the result of pass-through relationship. Independently of federal-funding status, Sunshine House is alleged to operate a private nursery school or other place of education and a day care center within 42 U.S.C. § 12181(7)(J)–(K). Upon information and belief, its operations effect commerce, including its alleged operation in North Carolina as a South Carolina corporation. Its Title III obligations are separate from the Board's Title II obligations.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10. Plaintiffs filed an IDEA due-process petition on February 10, 2026, docketed as OAH Case No. 26 EDC 00437, concerning delayed identification and evaluation, reduced preschool access, denial of FAPE, and educational harm.

11. Plaintiffs pursued the Petition through the June 22 partial summary-judgment order and August 10 final dismissal, contested the settlement, and sought restoration of the educational hearing. Under N.C. Gen. Stat. § 115C-109.6(f) and (h2), no further State administrative appeal of the final decision is available.

12. For the educational issues presented in the Petition and terminated by the final dismissal, Plaintiffs allege completion of the available administrative process.

13. Section 1415(l) requires exhaustion of non-IDEA claims seeking relief also available under IDEA but does not require IDEA exhaustion of claims seeking only remedies unavailable under that statute. Plaintiffs rely on completion of the available administrative process for the educational issues presented in the Petition.

14. This action challenges the final disposition of the issues presented to OAH. The discrimination claims are independent; Plaintiffs do not allege that OAH adjudicated ADA, Section 504, or Section 1983 liability.

## FACTUAL ALLEGATIONS

*Initial Enrollment, Screening, and Notice (Jul 2025 – Sep 2025)*

15. On or about July 2, 2025, the Parents submitted E.C.'s MECK Pre-K enrollment application, disclosing existing speech therapy and developmental and speech concerns. The application authorized specified partnering Pre-K agencies, including CMS and Smart Start, to exchange information for eligibility and program purposes. E.C. began attending the MECK Pre-K classroom at Sunshine House–Mint Hill in September 2025. The information-sharing authorization is not itself proof that CMS received every application disclosure on July 2.

16. On or about September 2, 2025, MECK Pre-K classroom personnel documented that E.C. was non-verbal, not potty-trained, actively receiving speech therapy, and unable to respond to Brigance screening tasks.

17. On or about September 9, 2025, Renee Little-Boyce, MECK Pre-K's Child Development Consultant (CDC), documented low screening scores across multiple developmental domains and formally recommended pursuing an evaluation through CMS.

18. On or about October 23, 2025, Sunshine House Regional Director Whitney Griffin told Mrs. Coleman that food brought from home required a medical need, completion of a Group Accommodations Checklist, a physician-completed Meal Modification Form, and company ADA review. Mrs. Coleman responded that she would have the pediatrician review and complete the paperwork.

Unilateral Schedule Reduction & Child Find Failure (Nov 2025)

19. On November 4, 2025, Renee Little-Boyce sent Mrs. Coleman an Adobe Acrobat Sign request for an *Alternate Schedule Request Form* proposing an 8:00 a.m.–11:30 a.m. day from November 10 through December 10, 2025. The form attributed the proposed reduction to E.C.'s need for more classroom support, frequent one-on-one guidance, low assessment results, limited verbal communication, and the Parents' refusal of the Applied Behavior Analysis ("ABA") referral. The signing sequence identified a Smart Start leadership address and the Sunshine House center address.

20. The proposed form described alternate schedules as requests requiring parent submission, but its parent-signature field remained unsigned in the exhibited copy. A date appeared beside that field and a leadership signature appeared below. Plaintiffs did not request or authorize the reduction.

21. On or about November 6, 2025, the Parents emailed Brittany Smith at Smart Start and Ms. Griffin at Sunshine House, copying the center and program addresses. They identified E.C.'s documented expressive and receptive language disorder, objected to a shortened day, requested continued full-day attendance, a Section 504 meeting, the identity of the Section 504 coordinator, and proposed another on-site MECK Pre-K classroom if the existing classroom could not

accommodate him. They also explained their understanding that MECK Pre-K administered the classroom although it was housed within Sunshine House.

22. The Parents consented to private speech and occupational therapy within the classroom and declined ABA at that time. They also expressly objected to implementation of an Individualized Learning Plan ("ILP") or Individualized Education Program ("IEP") and requested a Section 504 plan.

23. On or about November 7, 2025, the Parents requested speech-friendly and visual communication supports, daily parent-staff communication, collaboration with private therapists and continued full-day attendance while the formal-plan process proceeded.

24. On or about November 9, 2025, Ms. Smith, Smart Start's Child Development and Family Support Director, responded that MECK Pre-K operated under a different funding structure from a traditional local educational agency and was not held to the same laws or processes unless a formal IEP or Section 504 plan was in place. She acknowledged communication shortcomings, stated that ILP implementation would pause in response to the Parents' nonconsent, and said the adjusted schedule would remain, with its start extended to November 17. She identified it as the final support option then offered and discussed withdrawal or a different Sunshine House model if the family found MECK Pre-K unsuitable.

25. On or about November 19, 2025 Ms. Little-Boyce directed the Parents to adhere to an 8:00 a.m.–11:30 a.m. schedule stated to have taken effect November 17.

26. On or about November 20, 2026 a response from the Ms. Smith, stated that the schedule was already reduced and asserted the Director's authority over placement and support decisions. It attributed lack of a plan to the Parents' rejection of offered supports. The Parents disputed that characterization and reiterated their willingness to pursue speech and occupational therapy.

27. Plaintiffs allege that the directed half-day restriction denied equal access and caused lost instructional opportunity to the extent enforced. Their November 19 response also reported full-day attendance the preceding day, and teacher messages reflect some attendance beyond 11:30 a.m. The restriction was therefore not uniformly implemented on every date.

28. On or about November 20, 2025, the Parents requested transfer from Sunshine House–Mint Hill to Pride and Joy within MECK Pre-K and requested that E.C. attend for a full-day.

29. On or about January 17, 2026, Mrs. Coleman requested that E.C. be assigned a teaching-assistant or paraeducator to support him at the subsequent site.

30. The January 26 program response stated that MECK Pre-K did not provide individual paraeducator support beyond its lead-teacher/assistant model and that additional individualized services would have to be privately arranged. It also

described sensory supports supplied, including headphones, a chewy necklace, a weighted lap pad and a vibrating cushion.

31. Plaintiffs challenge categorical refusal to assess necessary individual modifications, not the mere use of standard staffing or failure to provide an aide automatically on request.

32. From November 19, 2025 to November 20, 2025, the Parents contacted CMS's Section 504 department, establishing actual notice to CMS of a suspected disability.

33. Kimberly Williams, a CMS preschool coordinating teacher, explicitly advised Mrs. Coleman by telephone that CMS could evaluate E.C., but that a Section 504 plan could not be implemented at the MECK Pre-K site and would not be available to him until kindergarten. Ms. Williams subsequently confirmed that information in an internal CMS email. This categorical response left E.C.'s disability-related needs unaddressed during a critical period of early childhood development.

34. Despite acknowledged notice on November 19, 2025, CMS did not convene its first Pre-K referral meeting until April 13, 2026, obtain written evaluation consent until April 22, 2026, or hold its first Section 504 meeting until April 24, 2026.

35. The June 22 order found failures of timely, documented evaluation procedures, prior written notice and procedural safeguards over approximately five months.

*Administrative Due Process Petition & Motion Practice (Feb 2026 – May 2026)*

36. On or about February 10, 2026, the Parents filed the Petition alleging Child Find violations, denial of FAPE, an unlawful reduction in educational access, and procedural harm.

37. On or about February 19, 2026, CMS received official notice of the petition. OAH issued a Notice Setting Hearing for the week of April 6, 2026.

38. On or about March 2, 2026, CMS filed a Motion to Dismiss.

39. On or about March 4, 2026, an IDEA-required resolution meeting was held; no agreement was reached.

40. Between March 28 and March 30, 2026, Plaintiffs declined voluntary mediation in writing and elected to proceed directly to an impartial due-process hearing. CMS nevertheless presented a DPI form preselecting mediation and requested their signatures.

41. Plaintiffs refused to sign unless the designation was corrected to reflect their election to proceed to hearing. They stated that they "respectfully request that this matter proceed directly to a due process hearing" and that their acknowledgment "does not waive our rights under IDEA and cannot be

interpreted as agreement to anything other than acknowledgment of the meeting and our preference to proceed to hearing."

42. On or about April 13, 2026, CMS convened its first Pre-K referral meeting, nearly five months after receiving notice of suspected disability.

43. On or about April 22, 2026, the Parents provided written consent for evaluation.

44. CMS held an initial Section 504 meeting on April 24, 2026.

45. The administrative case proceeded through dispositive motion practice before the tribunal. Plaintiffs do not allege that OAH adjudicated independent discrimination damages claims.

46. From May 28, 2026 to May 29, 2026, the parties filed a Joint Motion to Continue.

47. The tribunal rescheduled the evidentiary remedies trial for July 13, 2026 through July 17, 2026.

*Partial Summary Judgment, Educational Evidence, and Eligibility (June 2026)*

48. On or about June 22, 2026, the tribunal granted summary judgment as to procedural Child Find liability and denied the Board's motion. OAH found untimely evaluation procedures, prior written notice, and procedural safeguards following acknowledged notice on November 19, 2025. It reserved eligibility, educational harm, and compensatory education, if any, for hearing and expressly

stated that procedural violations alone do not necessarily establish denial of FAPE.

49. Separately from the tribunal's June 22 ruling, CMS's IEP team determined on June 22, 2026 that E.C. was eligible under Developmental Delay, Speech or Language Impairment, and Autism, and developed his initial Individualized Education Program ("IEP"). The IEP addressed his communication, behavioral, social-emotional, and adaptive needs and included speech/language and occupational therapy services.

50. The eligibility materials document severe receptive and expressive language difficulties, communication and adaptive limitations affecting classroom participation, and a need for specially designed instruction.

51. Plaintiffs' retained expert, Dr. Teresa Herrero Taylor, opined that delayed identification and service provision deprived E.C. of educational opportunity during a critical developmental period and could affect his developmental trajectory and skill acquisition.

52. On or about June 29, 2026, Plaintiffs rejected CMS's offer of approximately 34 hours of compensatory education and reaffirmed their election to proceed with the July 13–17 remedies hearing.

53. On or about June 30, 2026, Plaintiff's former counsel circulated a hearing-preparation meeting invitation consistent with that election.

54. On or about July 6, 2026, Plaintiffs filed a motion requesting remote participation for an expert witness at the remedies hearing. The tribunal subsequently reassigned the presiding adjudicative role.

55. On or about July 7, 2026, at approximately 4:06 p.m., CMS General Counsel questioned whether a settlement conference could occur without prior mediation, writing.

56. At approximately 4:45 p.m. that day, former counsel stated that Plaintiffs remained available for a July 9 or July 10 prehearing conference and were "also open and available for a settlement conference if that can be scheduled this week." Plaintiffs allege that their former counsel had not obtained their informed authorization to represent that they were available for settlement, following their rejection of CMS's offer and reaffirmation of the remedies hearing. Plaintiffs distinguish participation in discussions from authority to accept a settlement.

57. On or about July 8, 2026, at approximately 3:23 p.m., the tribunal issued an amended notice scheduling a Webex prehearing conference for July 10 at 1:00 p.m. Plaintiffs allege that they were not adequately informed that this was separate from the July 9 settlement conference. At approximately 3:33 and 3:46 p.m., Plaintiff's former counsel left voicemails advising that a settlement conference had already been scheduled for 9:00 a.m. the following morning and that she intended to prepare a settlement proposal that evening.

*Disputed Settlement Conference, Execution, Repudiation, and Dismissal*

58. On or about July 8, 2026, at approximately 3:59 p.m., the tribunal entered a settlement-role appointment order invoking 26 NCAC 03 .0107(b).

59. At approximately 4:05 p.m., it issued a Settlement Conference Notice and Order directing attendance at the courthouse at 9:00 a.m. the following morning and requiring a representative with settlement authority.

60. At approximately 5:32 p.m., Plaintiffs' former counsel emailed: "Attached is the Notice and Order of Settlement Conference for tomorrow morning at 9am. I know it's last minute. Can either one of you attend to make settlement decisions in real time?" Both Parents were petitioners. Plaintiffs allege that former counsel did not establish either parent's authority to bind the other and that Mr. Coleman had not authorized Mrs. Coleman or anyone else to settle or sign on his behalf.

61. Plaintiffs allege that neither Parent authorized former counsel to commit them to the July 9 proceeding and that they received approximately 16 hours' notice after its date, time, and location had been determined. Mrs. Coleman initially declined because of work obligations and requested remote participation.

62. According to Mrs. Coleman, prior counsel repeatedly stated that attendance was required by the tribunal's order, that remote participation was unavailable because "it's a court order," and that failure to appear could be considered noncompliance.

63. Mrs. Coleman alleges that, relying on these representations, she left work and arrived at the courthouse at approximately 10:35 a.m., where the tribunal admonished her for being two hours late. Mr. Coleman did not attend and continued his regular work schedule. Plaintiffs allege that they had not adequately understood that July 9 was a separate settlement conference rather than the prehearing conference described in their communications.

64. Mrs. Coleman alleges that, after she again declined settlement, the proceeding continued; the tribunal declined to permit her to take the proposed agreement home for review and instructed her to sign for herself and Mr. Coleman.

65. Mrs. Coleman alleges that she signed under significant time pressure because she needed to pick up E.C., who was the last child remaining at his summer camp. She recalls electronically signing at approximately 5:18 p.m. and leaving at approximately 5:20 p.m.

66. Mr. Coleman had not authorized her to sign or settle on his behalf.

67. The handwritten report was titled a "Settlement Conference" report and contained the notation "per dad (by mom)." Mrs. Coleman alleges that the tribunal instructed her to sign for both herself and Mr. Coleman. The words "Mediated Settlement Conference" appeared within the report, not in its title or the July 8 written order.

68. The formal agreement states a July 9, 2026 date and provides 103.5 hours of compensatory services, $890.27 for specified private therapy costs, up to $600 for documented transportation, and $5,000 in attorneys' fees.

69. It was filed July 16. The DocuSign certificate records signatures in both Parents' names on July 9, including a signature in Mr. Coleman's name at 5:17:08 p.m.

70. The final decision characterized the conference under N.C. Gen. Stat. § 115C-109.4(i) and § 150B-23.1, whereas the appointment order and agreement cite 26 NCAC 03 .0107(b).

71. Plaintiffs contend that the prerequisites applicable to a settlement conference in a FAPE case were not satisfied. They identify 26 NCAC 03 .0611(f), in conjunction with Rule .0107(b), as the governing pathway and contend that prior DPI mediation and a joint motion were required but did not occur. They request determination of the applicable rules and the legal consequence, if any, of noncompliance rather than treating a procedural defect alone as conclusively invalidating the agreement.

72. Plaintiffs further allege that the docket materials available to them do not identify a separate written mediated-settlement order bearing the designation "DESIGNATION OF MEDIATOR," selection or appointment of a mediator, or documentation establishing that the conference was conducted by a neutral mediator under the distinct mediated-settlement framework. They identify 26

NCAC 03 .0201–.0203 and N.C. Gen. Stat. § 150B-23.1 as the framework requiring examination. Plaintiffs request review of the complete administrative record; they do not equate the absence of a document from the materials they possess with conclusive proof that it does not exist.

73. Plaintiffs allege that the difference between the noticed settlement procedure and the later characterization as mediation materially affects whether participation was voluntary, what safeguards governed, and whether the resulting instruments extinguished the remaining educational controversy. The alleged prejudice is the loss of the scheduled July 13–17 remedies hearing and adjudication of the unresolved educational issues based on disputed assent and authority, not terminology alone.

74. On or about July 10, 2026, the tribunal entered an Order of Tentative Closure, removing the July 13 trial block from the calendar.

75. Plaintiffs communicated written repudiation on or about July 11, 2026, citing lack of authorization and involuntary assent, and filed their rescission motion on July 13.

76. On or about July 13, 2026, Parents terminated their attorney, elected to proceed *pro se*, and filed emergency motions seeking to set aside the settlement, restore the trial calendar, and vacate the tentative closure.

77. On or about July 14, 2026, OAH vacated its tentative closure, expressly kept the contested case open, directed production of the executed agreement, and held the request to reschedule the remedies trial in abeyance.

78. The Board opposed rescission, filed the agreement on July 16, 2026, and moved to enforce the settlement on or about July 23, 2026. Plaintiffs submitted materials disputing assent.

79. OAH struck supplemental submissions on or about August 5, 2026.

80. On or about August 10, 2026 OAH entered its Order of Dismissal and Order Denying Motions. It found voluntary participation in a mediated settlement conference and a July 9 agreement resolving the Petition, dismissed the Petition as moot, and denied both Plaintiffs' rescission motions and the Board's enforcement motion for lack of jurisdiction over contract claims. Plaintiffs challenge the settlement and mootness findings, not a nonexistent order granting enforcement.

81. On or about August 4, 2026, before final dismissal, CMS Preschool Program Manager Christina Mockridge wrote that the district owed compensatory services in special education, speech-language therapy and occupational therapy, and offered summer service times and transportation options

*82*. On or about September 30, 2026, the Board issued a check, payable to Mrs. Coleman for $1,490.27. Plaintiffs did not endorse, deposit or accept the check and received no services under the disputed agreement.

*Judicial Review of OAH Final Decision*

83. Plaintiffs are aggrieved by the final termination of the educational claims without the reserved hearing and seek relief under 20 U.S.C. § 1415(i)(2).

84. This federal civil action is authorized by 20 U.S.C. § 1415(i)(2)(A) and N.C. Gen. Stat. § 115C-109.6(h2).

85. Under 20 U.S.C. § 1415(i)(2)(C), Plaintiffs request the administrative record, appropriate additional evidence, and an independent determination on a preponderance of the evidence with due weight to the administrative proceedings.

86. OAH relied on a disputed agreement to extinguish the educational controversy while declining to determine the formation and enforceability issues on which that conclusion depended.

87. Plaintiffs request resolution of those threshold issues within this Court's jurisdiction and appropriate relief on the preserved educational controversy.

## CAUSES OF ACTION

## COUNT I — IDEA JUDICIAL REVIEW AND EDUCATIONAL RELIEF AGAINST THE BOARD

88. Plaintiffs incorporate by reference all preceding allegations of this Complaint as if fully set forth herein.

89. The June 22 order established the Board's procedural Child Find violations described above, not system-wide liability or a predetermined compensatory-education award.

90. Plaintiffs allege that the Board's delay after acknowledged notice prevented timely assessment of E.C.'s special-education needs, delayed development and availability of an individualized program, deprived him of specialized instruction and related-service opportunities during a critical developmental period, and significantly impeded informed parental participation. E.C.'s documented communication and adaptive difficulties and Dr. Taylor's educational-harm opinion support those allegations; they do not alone determine the amount of compensatory relief or prove regression.

91. Plaintiffs seek relief from the final dismissal and determination of eligibility for the relevant period, substantive educational harm, and appropriate individualized compensatory education and reimbursement.

## COUNT II — SETTLEMENT FORMATION, BINDING EFFECT, AND DECLARATORY RELIEF (AGAINST THE BOARD)

92. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

93. An actual controversy exists whether the July 9 instruments bind E.C., Mr. Coleman and Mrs. Coleman and extinguish the educational claims. Plaintiffs challenge assent and authority as to each instrument and affected person.

94. Mrs. Coleman lacked authority to settle Mr. Coleman's individual rights, sign his name to the handwritten report, or electronically execute an agreement for him. Plaintiffs did not give their prior attorney authorization to accept a settlement on their behalf. Furthermore, Mrs. Coleman's own assent was not voluntary for the specific reasons alleged above.

95. The DocuSign agreement must be considered separately from the handwritten report. Its certificate records signatures in Mr. and Mrs. Coleman's names on July 9 and completion that day.

96. Paragraph 6 of the formal agreement names IDEA, North Carolina special-education statutes and ADA Title II, and identifies the Board and its specified related persons as releasees for claims arising from the OAH petition through execution. Section 504 is not expressly named. Paragraph 7 requires dismissal of claims raised or that could have been raised in the Petition.

97. Plaintiffs seek construction of those provisions together, including whether any independently pleaded Section 504 claim or claim against a private Defendant

falls within them; omission of a statutory name is not alleged automatically to defeat a broader applicable release.

98. The agreement also contains authorized-representative, entire-agreement, severability and further-dispute-resolution provisions.

99. The July 11, 2026 repudiation and July 13, 2026 motion bear on assent, ratification, and any applicable avoidance right.

100. Plaintiffs request a declaration that the agreement or releases are nonbinding to the extent established by the evidence and law.

101. State-law questions are supplemental to the federal controversy.

102. Alternatively, even if some settlement obligations are binding, Plaintiffs request a determination of which persons, claims and periods were released, and whether the preserved educational controversy was fully resolved.

103. Plaintiffs request appropriate factfinding on genuinely disputed assent and authority and construction of the written instruments; they do not seek a declaration based solely on dissatisfaction with settlement terms.

## COUNT III — SECTION 504 DISABILITY DISCRIMINATION, UNEQUAL ACCESS, AND Failure to Provide Reasonable Accommodations (AGAINST THE BOARD, SMART START, AND SUNSHINE HOUSE)

104. Plaintiffs incorporate the preceding factual allegations concerning each Defendant's own conduct and E.C.'s disability, qualification, notice and resulting harm.

105. This count is asserted on E.C.'s behalf under 29 U.S.C. § 794 against each Defendant for which federal-funding coverage is supported.

106. E.C. has disabilities substantially affecting communication and developmental functioning and was otherwise qualified for the preschool benefit with reasonable disability-related accommodations.

107. The Board is alleged to be a federal financial-assistance recipient. The allegations of Smart Start's and Sunshine House's qualifying receipt are subject to verification.

108. E.C.'s documented receptive and expressive language impairment and developmental limitations substantially limit communication and learning. His qualification and need for accommodation did not depend on having a completed IEP or a separately signed Section 504 plan before discrimination protections could apply.

109. Smart Start, through the identified program personnel, prescribed a shortened day because of E.C.'s communication and support needs and maintained it after receiving requests for continued full-day access and alternative classroom supports. Plaintiffs allege denial of equal program participation solely by reason of disability and failure reasonably to accommodate those needs. They challenge a disability-based access restriction rather than merely disagreement over educational methodology or violation of an IDEA procedure.

110. As an additional theory under this count, Plaintiffs allege failure to provide necessary reasonable accommodations for meaningful participation: individualized consideration of visual and communication supports, coordination with permitted private speech and occupational therapists, and available classroom arrangements permitting equal access without a disability-based shortened day. They do not allege an unconditional entitlement to full-time one-to-one staffing or that every requested measure was required. The denial of equal access and failure-to-accommodate theories are pleaded in the alternative without duplicate damages.

111. The meal-modification correspondence is also relevant to Sunshine House's notice and accommodation procedures.

112. The November 6–7 requests, November 9 response, November 19 adherence instruction and November 20 assertion of decision-making authority support notice to Smart Start officials able to address the challenged access restriction.

113. Plaintiffs allege that maintaining the restriction on the stated no-formal-plan and staffing grounds, despite that notice, deliberately disregarded a substantial likelihood of violating E.C.'s nondiscrimination rights.

114. As to the Board, Plaintiffs rely on its acknowledged November 19 notice, referral to Exceptional Children staff, categorical response about Section 504 at the site, and ensuing procedural inaction.

115. As to Sunshine House, Plaintiffs rely only on established acts of its personnel concerning accommodations or implementation, not receipt of copied messages alone.

116. The loss includes denial of equal access, lost classroom and language-development opportunities, and documented additional therapy or related expenses caused by actionable discrimination.

117. Plaintiffs seek only legally recoverable, causally supported economic damages upon proof of intentional discrimination under the governing standard, including deliberate indifference if sufficient, and equitable relief within Article III limits. No emotional-distress or punitive damages are requested under this count, and no duplicate recovery is sought.

COUNT IV — ADA TITLE II DISABILITY DISCRIMINATION
(AGAINST THE BOARD ONLY)

118. Plaintiffs incorporate by reference all preceding allegations of this Complaint as if fully set forth herein.

119. The Board is a public entity. E.C. is a qualified individual with a disability entitled to nondiscriminatory access to its covered programs and services with reasonable modifications where necessary.

120. Plaintiffs allege that the Board's response after acknowledged notice and categorical statement about Section 504 availability denied meaningful disability-related access to its preschool identification, evaluation, and support

services. Attributing a partner site's earlier schedule reduction to the Board requires proof of its own participation, authorization, or covered contractual arrangement; collaboration alone is not the basis of liability.

121. Reasonable modifications were necessary to afford meaningful access to the Board's covered identification, evaluation and educational-support services.

122. The Board failed timely to address those needs after acknowledged notice and instead left the Parents without the IDEA process later found procedurally overdue.

123. The alleged denial of meaningful access was by reason of disability. Plaintiffs allege knowing disregard of E.C.'s access rights based on the notice and response described above, while recognizing that damages require intentional discrimination under the applicable standard. Educational-services claims are not subject to an additional education-specific bad-faith-or-gross-misjudgment requirement. *A.J.T. v. Osseo Area Schools, Independent School District No*. 279, 145 S. Ct. 1647 (2025).

124. No emotional-distress or punitive damages are requested under this count.

125. No Title II claim is asserted against Smart Start or Sunshine House merely because it is publicly funded or participates in MECK Pre-K.

126. No retaliation claim is based solely on the filing of the Board's settlement-enforcement motion.

127. Relief is requested for the Board's own discrimination without duplicating IDEA recovery.

128. Any prospective relief must address demonstrated ongoing or imminent injury to E.C.

## COUNT V — ADA TITLE III DISABILITY DISCRIMINATION AND FAILURE TO MAKE REASONABLE MODIFICATIONS (AGAINST SUNSHINE HOUSE ONLY)

129. On behalf of E.C., Plaintiffs incorporate the preceding factual allegations concerning his disability, enrollment, accommodation requests, Sunshine House's operation of the center, and conduct attributable to Sunshine House itself.

130. This count is asserted under 42 U.S.C. § 12182(a), (b)(1)(A) and (D), and (b)(2)(A)(i)–(iii), with private enforcement under § 12188(a).

131. Sunshine House is a private entity operating a nursery school, other place of education, and/or day care center whose operations effect commerce, and therefore operates a place of public accommodation within 42 U.S.C. § 12181(6)–(7).

132. The term public accommodation does not mean public entity. This count does not depend on receipt of federal financial assistance, designation as a local educational agency, or prior completion of an IEP or Section 504 plan.

133. E.C.'s documented communication and developmental impairments substantially limit communication and learning. He was enrolled in the preschool

program and, with necessary reasonable modifications, could participate in and benefit from its services. Plaintiffs requested continued access, visual and communication supports, coordination with private speech and occupational therapists, and consideration of classroom arrangements permitting participation without a disability-based shortened day.

134. Sunshine House had notice of accommodation concerns through Regional Director Whitney Griffin's meal-modification correspondence and the November 6–7 correspondence addressed to Griffin and copied to the center. Plaintiffs allege that, within those services, policies and practices Sunshine House operated or controlled, it failed to make necessary reasonable modifications and participated in unequal access because of E.C.'s disability.

135. The challenged modification practices include reliance on ordinary staffing or the absence of a formal plan as categorical reasons not to consider necessary, reasonable access measures, but only to the extent such practices are established as Sunshine House's own conduct.

136. Subject to establishing the foregoing standing facts, Plaintiffs seek an injunction requiring Sunshine House to provide an individualized assessment of necessary reasonable modifications and auxiliary aids within its own services and control; to cease disability-based unequal-access criteria not shown necessary; and to provide identified access measures required by § 12182.

137. Any declaratory relief is ancillary to a live, redressable controversy, not a declaration concerning completed conduct alone.

138. Plaintiffs seek only the private preventive and equitable relief authorized by 42 U.S.C. § 12188(a), together with reasonable attorneys' fees and costs where authorized by 42 U.S.C. § 12205.

139. No compensatory, nominal or punitive damages are requested under Count V, and no governmental civil penalty is sought

140. The damages requests under the other counts are not incorporated as a demand for Title III damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of their minor child, E.C., respectfully pray that this Court enter judgment in their favor and against Defendants, jointly and severally where authorized by law, and grant the following relief:

1. Grant appropriate relief from the August 10 final dismissal under 20 U.S.C. § 1415(i)(2), including determination of the disputed settlement's effect on the educational controversy.

2. Give appropriate effect to the June 22 procedural Child Find findings while determining the reserved issues of eligibility, harm, and remedies.

3. Determine whether the established procedural violations and alleged educational exclusion denied E.C. a FAPE during the relevant period.

4. Order individualized compensatory education against the Board, including appropriate specialized instruction and related services, in the scope and amount supported by educational evidence and necessary to remedy proven harm.

5. Order appropriate reimbursement of necessary, reasonable, documented private educational and related-service expenses resulting from proven denial of FAPE, without double recovery.

6. Declare settlement instruments or releases nonbinding to the extent established by the evidence and law, addressing authority, electronic execution, and each affected Plaintiff's rights.

7. If the agreement is a statutory resolution agreement, determine the effect and timeliness of the notice invoking Section 1415(f)(1)(B)(iv).

8. If no binding settlement resolved the controversy, grant appropriate relief enabling determination of the unresolved educational issues, including further administrative proceedings if appropriate;

9. Award legally recoverable economic damages for intentional discrimination without duplicating IDEA recovery;

10. On Count V, grant narrowly tailored preventive and equitable relief against Sunshine House under 42 U.S.C. § 12188(a), including necessary reasonable

policy modifications and auxiliary aids within its control, and attorneys' fees and costs where authorized by 42 U.S.C. § 12205;

11. Grant declaratory relief for proven disability discrimination to the extent supported by an actual controversy;
12. Award reasonable attorneys' fees, costs, and expert fees; and
13. Grant such other relief as is just and appropriate under the claims pleaded.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted, this 10th day of November, 2026.


THE LAW OFFICE OF NEUBIA L. HARRIS, PLLC

/s/ Neubia L. Harris
Neubia L. Harris
N.C. Bar No.: 42069
312 W. Millbrook Road, Ste. 141
Raleigh, NC 27609
(919) 526-0500 (telephone)
(919) 589-3935 (facsimile)
neubia@neubiaharrislaw.com
*Attorneys for Plaintiffs*